***********
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before the Deputy Commissioner and the briefs and oral arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award. Accordingly, the Full Commission AFFIRMS the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties through the Pre-trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. At all relevant times, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between plaintiff and defendant-employer on or about July 10, 2001, the date of the alleged injury by accident or occupational disease.
3. Travelers is the carrier on the risk.
4. The plaintiff's average weekly wage is $884.87, with a resulting compensation rate of $590.21.
5. The parties contend that the issues to be heard are
 A. Whether plaintiff's work as a Nuclear Medicine Technologist was a significant contributing factor in the development of lateral epicondylitis and radial and ulna nerve compression in his left arm?
 B. Whether plaintiff's work as a Nuclear Medicine Technologist placed him at an increased risk, when compared to the general public, of developing lateral epicondylitis and radial and ulna nerve compression in his left arm?
 C. If so, to what benefits is plaintiff entitled under the Act?
 ***********
Based upon all the competent evidence of record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 54 years of age. He graduated from high school and has a double associate's degree in liberal arts and nuclear medicine, a bachelor's degree in Biblical Studies and a divinity degree.
2. At the time of hearing, plaintiff was serving as a part-time pastor for Albertson Road Baptist Church in High Point, and receiving a monthly housing allowance of $700, but no salary.
3. Plaintiff began working for the defendant-employer on March 1, 1995, as a nuclear medicine technologist. In this position, he would inject a radioactive isotope into the body and then take images. The radioactive doses were shipped to defendant-employer's place of business in an "ammo" type box, which weighed 25 to 30 pounds. Inside the box were lead cylinders also called "pigs", which contained the individual syringes for particular patients. Each pig was about 12 inches long with a top and bottom that screwed together. Each weighed about two pounds. The pigs were packaged with the bottom side up.
4. To remove the pigs, plaintiff would reach into the box, pull the pig out with his left hand, hold the top with his right hand, rotate the bottom to open the pig and remove the syringe. He reversed this motion to close the pig. For both opening and closing, he turned the cylinder five to six times. He handled eight to ten pigs per day. Plaintiff's workstation was about four feet high and he did these maneuvers slightly above waist level.
5. After removing the syringes, plaintiff gave the injections to patients prior to imaging. He shared job duties with a co-employee and would give injections to 5 to 9 patients per day. Most patients were ambulatory and did not need assistance. Plaintiff would help guide them into the proper position on the table.
6. Plaintiff also did computer data entry for patient information, using a keyboard and mouse. Plaintiff estimated that about fifty percent of his workday involved computer work. He spent another ten percent of his day on paperwork, for which he used his right hand, as he is right hand dominant.
7. Another of plaintiff's duties was to perform daily quality control checks on the camera system. He pulled a cobalt sheet source from its container using his left hand and positioned it across the top of the camera. This sheet source was about two feet square and one inch thick and weighed about three to four pounds. He then entered the codes on the keypad and took images to check for quality. These quality control checks took about 30 minutes each day.
8. In November 1997, plaintiff sought medical treatment for symptoms that had developed over several months in his right elbow and was diagnosed with epicondylitis with mild radial tunnel syndrome.
9. Plaintiff presented to Dr. Daniel Murphy, an orthopedic specialist and in February 1998, Dr. Murphy performed a right elbow debridement.
10. Defendant-employer sent an ergonomics expert to view plaintiff's job and sent plaintiff for an independent medical examination at Greensboro Orthopaedic Center. Defendants accepted plaintiff's right elbow epicondylitis as a compensable workers' compensation claim, and he was paid medical and indemnity benefits.
11. Plaintiff returned to light duty work around mid-April 1998. However, his symptoms persisted and in May 1998, he underwent additional surgery, a decompression of the right elbow. Following the second surgery, when Dr. Murphy was considering releasing plaintiff to return to work in September 1998, plaintiff expressed reluctance and reservations about his ability to perform his job.
12. Review of Dr. Murphy's notes show that Dr. Murphy was provided with videotaped surveillance of plaintiff's activities, which convinced Dr. Murphy that plaintiff was capable of performing greater tasks than he related. Accordingly, Dr. Murphy sent plaintiff for a functional capacity evaluation ("FCE"). Following the FCE, plaintiff was released to return to work first with some restrictions and eventually to full duty. Plaintiff returned to his job as a nuclear medicine technologist.
13. In approximately May 2001, while removing source sheet in the course of his job duties, plaintiff noticed pain in his left arm. Shortly thereafter, he left for vacation. Upon return, his left arm continued to bother him and he sought medical attention.
14. On July 10, 2001, plaintiff again presented to Dr. Murphy with complaints of left elbow pain, which he reported had been bothering him for two to three months. Dr. Murphy's initial assessment was left elbow lateral epicondylitis, and ulnar nerve irritation at the cubital tunnel. He treated plaintiff with an injection of Aristospan/Marcaine. As set out in Dr. Murphy's notes, plaintiff told him that if the injections did not bring relief, he would prefer early operative intervention.
15. Apparently Dr. Murphy was not an approved provider with plaintiff's health care plan, so plaintiff sought treatment with Dr. Peter Dalldorf, an orthopedic specialist at Guilford Orthopaedic and Sports Medicine Center. Dr. Dalldorf first examined plaintiff on August 31, 2001, and concurred with Dr. Murphy's diagnosis that plaintiff was suffering from left elbow lateral epicondylitis with probable cubital tunnel syndrome.
16. On September 11, 2001, Dr. Dalldorf performed an ulnar decompression and extensor carpi radialis brevis ("ECRB") release on plaintiff's left arm. During surgery, Dr. Dalldorf found that the nerve was very irritable and a fascial band appeared to be compressing the nerve. He also found that there was significant degenerative tissue.
17. At plaintiff's September 17, 2001, follow-up visit, Dr. Dalldorf noted that plaintiff requested a note releasing him from work and that plaintiff was doing fine with pain medicine. Dr. Dalldorf gave plaintiff a note releasing him from work for 3 months as to heavy lifting, but noted, "If they can accommodate lighter duty with no use of his left arm, I think he probably could return earlier."
18. At plaintiff's December 5, 2001, visit to Dr. Dalldorf, plaintiff reported that he was improving and was off all pain medication. Plaintiff's therapy was due to end soon, and although Dr. Dalldorf had recommended further therapy, it had not been approved. Dr. Dalldorf noted that plaintiff was capable of light duty work. However, Dr. Dalldorf had concerns that the same type work as before could lead to further overuse problems and suggested that plaintiff would benefit from vocational rehabilitation and a different occupation. He wrote plaintiff a note releasing him from work through December 31, 2001, with a return to work date of "unknown."
19. Plaintiff never returned to work for defendant-employer after September 11, 2001. On or about December 9, 2001, defendant-employer terminated plaintiff's employment. Plaintiff received $4287.38 in short-term disability benefits, with defendant-employer paying all the premiums for the disability policy.
20. On December 31, 2001, and January 20, 2002, plaintiff returned to see Dr. Dalldorf with complaints of continued discomfort in his left elbow. On February 27, 2002, plaintiff reported to Dr. Dalldorf that the tennis elbow band the doctor had given him had made his numbness and tingling worse. Dr. Dalldorf recorded, "he is still not able to work, as he is not able to grip and use his arm." Dr. Dalldorf started plaintiff on Celebrex, and noted that a further ECRB release might be needed if plaintiff did not improve.
21. In February 2002, plaintiff applied for unemployment compensation benefits. Beginning on or about March 10, 2002, and continuing until about August 11, 2002, plaintiff received unemployment compensation benefits at the rate of $376 per week and received a total of benefits in the amount of $9,108.00.
22. On March 27, 2002, plaintiff again presented to Dr. Dalldorf and they discussed the plaintiff's problems with insurance coverage for the therapy or treatment recommended. Plaintiff told Dr. Dalldorf that he was looking for employment and Dr. Dalldorf noted, "I think that he can work but he does not have any [work] available to him at this time."
23. As a consequence of plaintiff's ongoing complaints in follow-up visits, Dr. Dalldorf recommended a repeat exploration and more extensive release of his left elbow. At the time of the hearing before the Deputy Commissioner, plaintiff had not proceeded with the surgery, due to the lack of insurance coverage. Plaintiff was not at maximum medical improvement.
24. Dr. Dalldorf opined that plaintiff's employment was a causative factor in his development of lateral epicondylitis and ulnar nerve compression and that the employment also placed plaintiff at an increased risk of developing the condition.
25. Dr. Paul Perlik, an orthopedic specialist, was consulted on behalf of defendants. He reviewed plaintiff's medical records and a video purporting to represent plaintiff's job, but did not actually examine plaintiff. Dr. Perlik testified, contrary to Dr. Dalldorf, that plaintiff's job duties did not significantly contribute to the development of his lateral epicondylitis.
26. In weighing the medical evidence, the Full Commission gives greater weight to the testimony of Dr. Dalldorf since he was plaintiff's treating physician. His testimony establishes that plaintiff's lateral epicondylitis and ulnar nerve compression are conditions that are causally connected to his employment with the defendant-employer and should be found to be compensable.
27. The greater weight of the evidence shows that plaintiff's employment as a nuclear medicine technologist placed him at an increased risk of developing these conditions compared to the general public.
28. Plaintiff testified that he had looked for work, but had not found anything, other than his work as a minister, for which he receives a housing allowance. Plaintiff contacted North Carolina Vocational Rehabilitation for evaluation. He also applied for at least two jobs per week as required by the Employment Security Commission.
29. At the hearing before the Deputy Commissioner, Jane Grayson, a vocational evaluator for the North Carolina Division of Vocational Rehabilitation in Lexington testified. Ms. Grayson evaluated plaintiff on March 13, 2002. Her evaluation included an interview with plaintiff, assessing his background, education, experience and physical condition, as well as some testing. Ms. Grayson identified some areas for career placement, but noted that plaintiff would need additional training before he would be qualified for these positions.
30. As of the hearing before the Deputy Commissioner, plaintiff had not returned to any employment. However, plaintiff is well educated, intelligent, and capable. As testified by Ms. Grayson, with additional training, plaintiff should be employable in the future. It is anticipated that, given his education, experience and aptitude, once plaintiff has further surgery, physical therapy and is released by his treating physician, he will be an excellent candidate for retraining and should return to gainful employment.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff bears the burden of proving each element of compensability in order to prove the existence of an occupational disease within the meaning of N.C. Gen. Stat. § 97-53(13). This requires plaintiff to show that (1) the disease must be characteristic of a trade or occupation; (2) the disease must not be an ordinary disease of life to which the public is equally exposed outside of the employment; and (3) there must be proof of causation. Hansel v. Sherman Textiles, 304 N.C. 44, 283 S.E.2d 101
(1981). In the instant case, plaintiff has carried the burden of proof to establish that his employment as a nuclear medicine technologist was a significant contributing factor in the development of his left lateral epicondylitis and ulnar nerve compression and that his employment with defendant-employer placed him at an increased risk of developing these conditions compared to the general public. N.C. Gen. Stat. § 97-53(13).
2. As a consequence of his left lateral epicondylitis and ulnar nerve compression, plaintiff has been unable to earn wages in the same or any other employment and is entitled to temporary total disability compensation at the rate of $590.21 per week from September 11, 2001, and continuing until further Order of the Industrial Commission. N.C. Gen. Stat. § 97-29.
3. As a consequence of his left lateral epicondylitis and ulnar nerve compression, Plaintiff is entitled to have defendants pay for medical expenses incurred or to be incurred as a result of plaintiff's occupation disease as may be required to provide relief, effect a cure or lessen the period of disability. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
4. Defendants may seek credit for both the short-term disability benefits and unemployment benefits paid to plaintiff pursuant to N.C. Gen. Stat. §§ 97-42 and 97-42.1.
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney's fees hereinafter approved, defendants shall pay plaintiff temporary total disability compensation at the rate of $590.21 per week from September 11, 2001, and continuing until further Order of the Industrial Commission. All amounts accrued shall be paid in a lump sum, also subject to the attorney's fee and credits approved below.
2. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff for treatment of his left arm lateral epicondylitis and ulnar nerve compression, including the further surgery recommended by Dr. Dalldorf, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or lessen plaintiff's period of disability. Dr. Dalldorf is approved as plaintiff's treating physician for his left arm injury.
3. An attorney's fee of twenty-five percent (25%) of the compensation awarded to plaintiff is approved for plaintiff's counsel. Twenty-five percent of the lump sum due plaintiff shall be deducted therefrom and paid directly to his attorney. Thereafter, every fourth check shall be paid to plaintiff's counsel.
4. Defendants are allowed credit against the temporary total disability benefits awarded to plaintiff for both the short-term disability benefits and unemployment benefits previously paid to plaintiff on behalf of defendants pursuant to N.C. Gen. Stat. §§ 97-42, 42-1.
5. Defendants shall pay the costs.
This the ___ day of November 2005.
 S/_____________ PAMELA T. YOUNG COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER